HAROLD D. ADAMS *et al.*, Petitioners-Appellees, *v.* BRIDGETT LYNN ADAMS *et al.*, Defendants.—(KATHERINE ATCHLEY, Defendant-Appellant.)

Fifth District    No. 81-123

Opinion filed January 8, 1982.

James M. Martin, Mark R. Bahn, and John Malec, all of Martin, Bahn and Cervantes, of Columbia, for appellant.

William F. Meehan, P. C., of Cairo, for appellees.

JUSTICE JONES delivered the opinion of the court:

Petitioners, Harold and Cynthia Adams, sought to adopt two minor children, Bridgett Lynn Adams and Tiffany Ann Adams. Defendants, Jimmy Lowery, the natural father of Bridgett Lynn Adams, and Gale Quick, the natural father of Tiffany Ann Adams, were served by publication but did not appear or otherwise defend. After a hearing the trial court found "by clear and convincing evidence" that the defendant Katherine Atchley, the natural mother of both children, was unfit for failure to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the children (Ill. Rev. Stat. 1979, ch. 40, par. 1501(D)(b)). The trial court terminated the parental rights of the natural parents and, finding that adoption was in the best interests of the two minor children, entered a judgment granting the petition for adoption. The trial court having denied the natural mother's post-trial motion to vacate the order terminating her parental rights and to conduct a rehearing or hear additional evidence, she now appeals raising three issues: (1) "whether the Statute employed by the Court is constitutionally permissible," (2) "whether the Trial Court's Order is against the manifest weight of the evidence," and (3) "whether the Trial Court correctly applied Illinois Law," which presents a conflict of laws question. In view of the fact that appellant raises the constitutional question and the conflict of laws question for the first time in this court, we deem those two issues waived and decline to consider them. We turn to the question of whether

the trial court's finding of unfitness was contrary to the manifest weight of the evidence.

The principal witnesses to testify at the unfitness hearing were Harold and Cynthia Adams, Katherine Atchley, and her sister, Marsha Kramer. Katherine Atchley is the daughter of Harold Adams. Cynthia Adams is her stepmother, her own mother having died in 1971. On April 12, 1973, at the age of 21, Katherine Atchley gave birth out of wedlock to Bridgett Lynn Adams. In December of 1973, when Bridgett was seven months old, Harold and Cynthia Adams took the child to live with them at the request of Katherine Atchley. On September 16, 1974, Katherine Atchley gave birth out of wedlock to Tiffany Ann Adams. When that child was about a month old, Harold and Cynthia Adams took her to live with them with the consent of Katherine Atchley. When Katherine was 24 she married John Atchley. That marriage, a childless one, ended in divorce three years later. The two children have lived with and have been cared for by the Adamses since their infancy.

Cynthia Adams testified that in December of 1973, while she and her husband were living in Florida, Katherine Atchley, who was living in St. Louis, Missouri, called them to say that she could not raise Bridgett and to ask if they would come and get the baby. The witness stated that "we asked her if it was money problems or we ask [sic] her if she'd come to Florida and live with us or what the problem was and she said just, said I can't raise her." Cynthia Adams testified that Katherine refused an offer of money and that, in response to an offer to live with the Adamses in Florida with her child, Katherine said that she "didn't want to leave her friends." The witness said that during the five years that she and her husband lived in Florida with Bridgett, Katherine did not see the child. She testified further that with respect to the second child, Tiffany Ann, Katherine's sister, Marsha, who lived near Katherine, had called the Adamses to tell them that "Kathy had had her baby and that she had given it up." The Adamses thereupon called Katherine, who told them she had an appointment "to go sign consent papers for the people to adopt Tiffany." The Adamses asked her to consider letting them "bring Tiffany down to raise her with Bridgett and she said she would think about it and call us back." Cynthia Adams stated that Katherine again gave as the reason for not wanting to come to live with the Adamses and, by now, her two children, that "[s]he didn't want to leave her friends." The witness testified that during the five-year period from 1973 to 1978 when they lived in Florida with, first, Bridgett and, then, Tiffany there was no contact between Katherine and the two children. The witness said that Katherine called the Adamses during this time but did not speak to or ask about the children. She stated that during the seven-year period in which

they had, first, one and, then, both of the girls Katherine never offered any money for the support of the children and that the Adamses never refused any such offer from her.

Cynthia Adams said that in 1975 Katherine Atchley came to Florida with a girlfriend and told them the night she arrived that she had come to take the children. The Adamses met her that night at a McDonald's restaurant near their home to discuss the matter. Katherine did not see the children during this one-day visit. Cynthia Adams testified that Katherine had said she was taking a trip and was on her way to Daytona Beach. The witness testified that in 1975 she took the children to St. Louis, Missouri, to the home of her stepdaughter, Marsha, Katherine Atchley's sister. Cynthia Adams had asked Marsha to call Katherine, who lived about five miles away, to ask her to come to see the children while they were there. Katherine refused to come and sent no presents to the children. In 1977 Harold Adams asked Katherine to come to Florida. She did so but did not see the children at that time, because, as other testimony indicated, they were elsewhere with Cynthia Adams as the result of marital difficulties between the two. Moving from Florida in 1978, the Adamses lived in Olive Branch, Illinois, for a few months before moving to Cape Girardeau, Missouri. While they lived in Olive Branch, the witness said that Katherine Atchley did not call the children, write to them, ask to see them or inquire about their welfare.

As a result of a *habeas corpus* proceeding in which Katherine Atchley sought custody of the children, she received on October 24, 1978, visitation rights for the hours between 1 and 5 p.m. on alternate Saturdays and Sundays. Cynthia Adams testified that the visitation rights were in effect for "at least a year," that the number of visits Katherine Atchley made to the children amounted to "[a]t the most, fifteen," and that Katherine did not always use the entire period of visitation. During this time Katherine Atchley was living, according to the witness, "no more than ten miles" from the children in consequence of another move by the Adamses. The witness testified that she never discouraged visitation. The witness thought that in addition to visiting the children during this period Katherine Atchley had called Bridgett once.

Harold Adams testified that when Katherine came to Florida in 1975 he did not allow her to see the children on advice of his attorney. He said that he remembered her demanding the children once, during the one-day visit in 1975. He said that when he spoke with her while the Adamses lived in Florida with the children she did not, "to the best of [his] knowledge," inquire about the children.

Katherine Atchley's sister, Marsha Kramer, testified in behalf of the petitioners. She testified with respect to the circumstances under which

Katherine Atchley had relinquished custody of the children to the Adamses. She said that she and Katherine had called Cynthia Adams "to come up and get Bridgett." She stated that at that time Cynthia Adams offered to take Katherine Atchley into her home with Bridgett so that Katherine could raise the child but that Katherine declined the offer because "all her friends were up here" and she would not leave them. The witness testified that after Tiffany was born Katherine called her and said that "she had taken Tiffany back to the doctor [*sic*] that the doctor had a couple that wanted to adopt her and then he was going to keep her over night and give her enough time to decide if she wanted to do it for sure, and she was real upset and so I went down to where she was staying with a couple and she said that she couldn't raise Bridgett, that she didn't see how she could raise Tiffany, that she thought that was the best thing for Tiffany that this family would give her a good home and stuff." The witness said that after learning that Katherine was going to put Tiffany up for adoption she called her father with the information and that he had asked whether she thought Katherine would let the Adamses take Tiffany and raise the two girls together. Asked, "Prior to the Adams coming to pick up Tiffany and bring her down to Florida, did you have any discussion with Katherine about what arrangements or agreements or understanding was between the Adams and Mrs. Atchley as to the custody of Tiffany?" the witness answered that she had "talked to Kathy to see if that's what she wanted to do" and that "[s]he said that you know, I'll let her go down, Tiffany go down to Florida if they'll promise not to let me see her again." The witness was not aware of any time when Katherine had seen the children during the five-year period the Adamses lived in Florida with Bridgett and the four-year period they lived there with Tiffany. She testified that the Adamses had not to her knowledge discouraged Katherine from seeing the children. Of the trip to St. Louis with the children that Cynthia Adams had referred to in her testimony, the witness said, "I called her and told her that Cindy was going to be there and asked if she would like to come see them? [*Sic.*] She said she couldn't see them, because she couldn't see them and just leave them so she wouldn't come." The witness stated that once Katherine had given her money to buy clothing for the girls and that once she had given her toys for the girls.

Testifying in her own behalf, Katherine Atchley denied that her father had offered her money when she called to have him take the infant Bridgett. She said that the understanding between her and her father at the time he took Bridgett to Florida was "[t]hat when I got on my feet that my child would be returned to me." She said that she had, apparently once, mailed clothes to Bridgett in Florida and that she had made telephone calls "quite often"—how often she could not say—in order to

"see how Bridgett was doing." Of Tiffany she said that she could not raise the child at the time of her birth because, as was the situation with Bridgett, of her strained financial circumstances. Asked, "What sort of arrangements had you made with Cindy and your father concerning the care of Tiffany?" she answered, "That they were to come up and get Tiffany and take care of her until I could have some responsibility." After Tiffany was taken to Florida in 1974 the witness began to work as a waitress at West County Famous Barr where she was still employed at the time of the hearing six years later. She said that she had sent a check for $100 to the Adamses shortly after Tiffany was taken to Florida but that the check was never cashed. She testified that in June of 1975 she went to Florida, without giving notice of her doing so to the Adamses, in order "[t]o get my children" and that her father advised her to speak with the Adamses' attorney because they were trying to adopt the children. Asked whether the Adamses refused to let her see the girls, she answered, referred to the nighttime meeting at the McDonald's restaurant, "Well I didn't come right out and ask to see the girls, I just told them I was there to get the girls and a block from the house, I didn't see why they didn't bring them with them." She said that after her trip to Florida in 1975 she called "quite often" to say "[t]hat I wanted my children."

Katherine Atchley testified that she had provided support for the children after June of 1975, describing it as follows: "Well after the check was not cashed my sister had frequent contact and would go on vacation and visit my father and so I sent toys and I also sent money with her." She said she had sent "$100.00 by my sister." Of the visitation rights granted on October 24, 1978, she said that she worked on Saturdays and that she had not visited on a few of the Sundays, explaining, "I did miss a few because of the weather, I wouldn't take the girls out in bad weather." She said she had missed visitation also because she "went over there a few times and they were not there." The truth of this statement Cynthia Adams, testifying again, later denied. Asked if she had other contact with her children during this time, Katherine Atchley answered, "Probably." She testified that she had asked to see the girls at other times and that "[a] lot of times I could see them, it wasn't my day to visit."

In a subsequent *habeas corpus* proceeding occasioned by a move by the Adamses to Illinois, Katherine Atchley obtained visitation rights, which she exercised. The distance between her residence and that of the Adamses after this move to Illinois was about 120 miles.

In its order terminating Katherine Atchley's parental rights the trial court found specifically that

> "Katherine Atchley voluntarily gave up custody of Bridgett Lynn Adams to Petitioner Harold D. Adams to be taken to Florida, on or about November 1973, when the child was seven months old, and

from the time of this relinquishment of custody until almost five years later, Defendant Katherine Atchley never saw Bridgett Lynn Adams, spoke with her or maintained any personal contact with her. In addition, Defendant Katherine Atchley voluntarily relinquished custody of her daughter Tiffany Ann Adams to the Petitioners in October of 1974 to be taken to Florida, and that from the date of Defendant Katherine Atchley's relinquishment of custody of Tiffany until after January of 1978, Defendant Katherine Atchley did not visit, speak with or maintain any personal contact with Tiffany Ann Adams. Furthermore, Defendant Katherine Atchley rejected, without any reasonable explanation, an offer extended to her by the Petitioners for her to move with her daughters into the Petitioner's home in Florida. Finally, Defendant Katherine Atchley has failed to provide adequate support for either Bridgett Lynn Adams or Tiffany Ann Adams, and the conduct of Defendant Katherine Atchley on the whole has exhibited an unreasonable regard for the welfare of her daughters."

■■ As we said in *Pyatt v. Pyatt* (1980), 88 Ill. App. 3d 8, 19, 410 N.E.2d 241, 248,

"To justify termination of parental rights, the parent's unfitness for the exercise of parental rights must be established not merely by a preponderance of the evidence but by clear and convincing evidence presented in strict compliance with the Adoption Act. [Citation.] It is axiomatic that a court of review may not disturb the findings of the trial court unless they are palpably against the manifest weight of the evidence. [Citation.] The opportunity of the trial court to observe the conduct and the demeanor of the parties while testifying is, of course, a vital factor in the evaluation of the correctness of the court's determination."

In the case at bar, insofar as the testimony of the witnesses was conflicting, and it was on numerous points which need not be reiterated, the trial court apparently resolved questions of credibility against the defendant Katherine Atchley. We do not question that determination, given the opportunity of the trial court to observe the demeanor of the witnesses as they testified. Defendant Atchley urged the trial court, and calls attention to this fact in her brief here, to evaluate her conduct "at the time of the filing of the Petition [which occurred on May 30, 1980] in determining the fitness of the mother." We cannot agree that the period of time of conduct to be considered by the court should be so limited. In determining fitness a court must look not to the conduct of the parent during any single, isolated period of time but to the conduct of the parent over the entire period of time in question, that is, to the entirety of the

parent's conduct. Using this principle as a guide in our examination of the entire record on appeal, we cannot say that the trial court's finding of unfitness was contrary to the manifest weight of the evidence.

Affirmed.

KASSERMAN and WELCH, JJ., concur.