157 Ill. App.3d 396 (1987)
510 N.E.2d 541
In re J.R.Y., Alleged to be a Neglected Minor (The People of the State of Illinois, Petitioner-Appellee,
v.
John Yelliott, Respondent-Appellant).
No. 4-86-0781.
Illinois Appellate Court  Fourth District.
Opinion filed June 29, 1987.
*397 David W. Butler, of Bloomington, for appellant.
Charles G. Reynard, State's Attorney, of Bloomington (Kenneth R. Boyle, Robert J. Biderman, and Linda Cullom, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.
Alan Novick, of Bloomington, guardian ad litem.
Order affirmed.
JUSTICE LUND delivered the opinion of the court:
The circuit court of McLean County entered an order on October 27, 1986, terminating the parental rights of John Yelliott to his minor daughter, J.R.Y., pursuant to section 1(D)(m) of the Adoption Act (Ill. Rev. Stat. 1985, ch. 40, par. 1501(D)(m)). John Yelliott appeals.
J.R.Y. was taken from the custody of her mother because of alleged abuse and neglect, and in an order entered March 13, 1984, at a dispositional hearing, was adjudicated neglected and made a ward of the court. Guardianship was placed with the Guardianship Administrator of the Illinois Department of Children and Family Services. On May 22, 1985, a "Petition to Terminate Parental Rights to John Yelliott" was filed stating:
"6. That the father of said minor is an unfit parent under Chapter 40, Section 1501, IRS (1983), and that his parental rights should be terminated for the reason that:
he has failed to make reasonable progress toward the return of the minor to his care, subparagraph (D)(m), in that:
A) he has never had custody of the minor;
B) on 10 January 1985 he plead [sic] guilty (84 cf 247) to the felony offense of Residential Burglary, which he committed on 14 July 1984, being sentenced for that offense on 21 January 1985 to 6 1/2 years incarceration in the Illinois Department of Corrections;
C) he has failed to correct his alcoholism in that, having had two terms of treatment at the Chemical Dependency Unit of Brokaw Hospital (one in May of 1984, the second in July 1984), he continued to drink to a point of intoxication on an almost daily basis during the late summer and early *398 fall of 1984;
D) due to his inability during the last 14 months to comply with the criminal laws of Illinois, and his inability to make any progress in correcting his alcoholism, he is unable to assume custody of the minor at this time and has made little or no progress in bringing himself nearer that goal."
The hearing on the petition was held on September 18, 1986. John Yelliott had never been a custodial parent of J.R.Y., as he had not cohabited with J.R.Y.'s mother during J.R.Y.'s lifetime.
On appeal, John Yelliott makes four allegations of error. They are: (1) the reasonable progress provisions of section 1(D)(m) of the Adoption Act (Ill. Rev. Stat. 1985, ch. 40, par. 1501(D)(m)) do not apply to a noncustodial parent; (2) the trial court committed error in taking judicial notice of the proceedings in case No. 84CF247, a felony case involving John Yelliott; (3) the trial court erred in not dismissing the termination petition at the close of the State's case; and (4) the finding of the trial court terminating his parental rights was against the manifest weight of the evidence.
Section 1(D)(m) of the Adoption Act (Ill. Rev. Stat. 1985, ch. 40, par. 1501(D)(m)) provides as follows:
"D. `Unfit person' means any person whom the court shall find to be unfit to have a child, without regard to the likelihood that the child will be placed for adoption, the grounds of such unfitness being any one or more of the following:
* * *
(m) failure by a parent to make reasonable efforts to correct the conditions which were the basis for the removal of the child from such parent, or to make reasonable progress toward the return of the child to such parent within 12 months after an adjudication of neglected minor under Section 2-4 or dependent minor under Section 2-5 of the Juvenile Court Act."
In subsection (E) of section 1, "Parent" is defined as "the father or mother of a legitimate or illegitimate child." Ill. Rev. Stat. 1985, ch. 40, par. 1501(E).
The March 13, 1984, dispositional order was effective as to both mother and father, even though the parents did not cohabit, and the mother was the custodial parent. The order of February 7, 1984, which stemmed from the earlier adjudicatory hearing, found allegations of neglect proved, but also found that the neglect was "not by reason of physical abuse." The order of March 13, 1984, found:
"That the parents of the above minor are unable for some reason other than financial circumstances alone, to care for, *399 protect, train, or discipline the minor or are unwilling to do so.
That it is in the best interest of the above minor to take her from the custody of her parents."
 1, 2 We find no cases specifically applying section 1(D)(m) of the Adoption Act to a noncustodial parent, but this absence of authority does not prohibit the use of common sense in giving this subsection a broad interpretation. A noncustodial parent, who has been made part of a neglect proceeding resulting in an order placing custody with a State agency, should not be free from the requirement of taking the responsibility for correcting the neglect conditions. To say that the custodial parent's rights could be terminated for failure to make reasonable efforts to correct the conditions, or to make reasonable progress toward the return of the child, while the noncustodial parent could avoid termination simply because he does not have, nor has ever had, custody escapes logic. Such a holding could result in a child being faced with foster care until majority, and being deprived of the chance for the benefits of an adoptive home. In a case such as this one, such a result is clearly against the best interests of the minor. If there has been any doubt in the past, we now hold the parental rights of a noncustodial parent can be terminated under the provisions of section 1(D)(m) of the Adoption Act (Ill. Rev. Stat. 1985, ch. 40, par. 1501(D)(m)). This holding does not unduly deprive the noncustodial parent of his parental rights. He is required to step in during a guardianship administered by the Department of Children and Family Services and correct conditions of neglect and make reasonable efforts to help the minor return to the custody of one of the natural parents. A noncustodial parent is charged with as much responsibility as a custodial parent for the support, protection, and care of a child. (Kelley v. Kelley (1925), 317 Ill. 104, 110, 147 N.E.2d 659, 661-62; Elble v. Elble (1968), 100 Ill. App.2d 221, 226, 241 N.E.2d 328, 331.) "When a father loses custody of his children * * *, he does not also lose all parental obligations." De Franco v. De Franco (1978), 67 Ill. App.3d 760, 770, 384 N.E.2d 997, 1005.
We next consider the propriety of the trial court's taking judicial notice of McLean County felony case No. 84CF247, in which John Yelliott was the defendant. The felony file contained, in addition to the evidence of a criminal conviction, a presentence report which set forth Yelliott's prior criminal history and discussed his struggle with alcohol. Part of the objection is whether this information is relevant to a proceeding to terminate parental rights. As indicated by the allegations of the petition to terminate, Yelliott's criminal conduct and alcohol use formed the basis for the argument that he was not making *400 reasonable progress for returning J.R.Y. to his home. The relevancy is clear.
 3-5 As to the admissibility of this information by judicial notice, we recognize that courts may take judicial notice of matters of record in its own proceedings. (People v. Knight (1979), 75 Ill.2d 291, 296, 388 N.E.2d 414, 417; People v. Davis (1976), 65 Ill.2d 157, 161, 357 N.E.2d 792, 794.) In a bench trial, the trial judge is presumed to have relied only on competent and admissible evidence. (People v. Ellis (1983), 113 Ill. App.3d 314, 320, 446 N.E.2d 1282, 1286.) Yelliott pleaded guilty to a residential burglary committed on July 15, 1984. This amounts to a judicial admission which we find is admissible in the proceeding to terminate parental rights because of its relevance to the issue of whether Yelliott was making reasonable progress in bringing about J.R.Y.'s return to his home. (Accord People v. Powell (1982), 107 Ill. App.3d 418, 437 N.E.2d 1258; Cogdill v. Durham (1976), 43 Ill. App.3d 940, 358 N.E.2d 6; M. Graham, Cleary & Graham's Handbook of Illinois Evidence sec. 802.4, at 529 (4th ed. 1984).) At the sentencing hearing, Yelliott was given the opportunity to correct any errors in the presentence investigation report. He stated he had read the report and had no corrections. We find Yelliott's statements regarding the report to be judicial admissions, and because of its relevance to the present civil proceeding, the report is admissible. There was no error in taking judicial notice of the felony case.
The remaining two issues basically are determined by examining the sufficiency of the evidence and will be considered together.
The State first asked the court to take judicial notice of case No. 84CF247. This felony case involved a residential burglary on July 15, 1984, in Bloomington. Yelliott was arrested on October 7, 1984, and entered into a plea agreement on January 10, 1985. A presentence report was filed January 18, 1985, and on January 21, 1985, John Yelliott was sentenced to a term of 6 1/2 years' imprisonment. The presentence report indicated Yelliott was born April 5, 1956, quit high school during his sophomore year, took bookkeeping courses at Menard, was unemployed but had worked for a time as a self-employed house painter, and stated to the reporting officer that he was getting drunk daily on beer and whiskey prior to incarceration. Yelliott's juvenile record covered a period from September 1970 through June 1974 and included commitment to the Illinois Youth Commission for involvement in burglaries and aggravated battery. Parole was terminated in October 1971 for truancy and in September 1973 for burglary.
The adult record started with disorderly conduct in June 1972. In December 1974, he was sentenced to 75 days in the county jail for *401 battery. In addition to other minor offenses and short jail sentences, Yelliott was sentenced in May 1975 to 180 days for battery, in December 1975 to 90 days for resisting and obstructing a peace officer, in December 1976 to 1 1/2 years at the Department of Corrections for burglary, in January 1982 to 60 days for resisting a peace officer, in January 1982 to 364 days at the Department of Corrections for battery, and in August 1982 to 364 days at the Department of Corrections for retail theft.
The report indicated Yelliott had never married but was the father of three children, two by the mother of J.R.Y. Yelliott was quoted as saying J.R.Y.'s mother would not allow Yelliott to see his children, and he did not pay child support. All evidence of prior offenses came from the presentence report.
The State's only other evidence came from Ruth Sault, a follow-up caseworker and child welfare worker for the Department of Children and Family Services. She first met with John Yelliott in January 1984, at which time visitation with J.R.Y. was arranged. On March 2, 1984, she discussed the dispositional report with Yelliott, and at that meeting he "stated that he wanted to be able to see her [J.R.Y.] but did not want to raise her, be her parent because he had too many loose ends." The dispositional report, in part, related to placement, and Yelliott was considered a logical resource for consideration. At that time, Yelliott was living with a girlfriend, who was pregnant with his child.
On June 21, 1984, Sault testified she talked to Yelliott while he was visiting J.R.Y., and she asked "how things were since being at C.D.U.," meaning the Chemical Dependency Unit at Brokaw Hospital, and he answered in a positive manner. He also was asked if he would like to be considered as a placement resource for J.R.Y., and he said, "Yes." There was discussion of Alcoholics Anonymous involvement. At a June 25, 1984, administrative case review, a service plan was reviewed with Yelliott which sought to plan eventual permanent placement for J.R.Y. with him. On July 6, 1984, Sault again met with Yelliott and discussed placement with him. In the words of Sault, "he continued to state that he wanted to be that placement resource." On July 6, 1984, the next meeting was scheduled for September 4, 1984. On July 15, 1984, Yelliott committed the residential burglary. The September 4, 1984, meeting was cancelled by Yelliott because of a dental appointment. When Sault suggested a rescheduling, Yelliott stated he would have to get back with her. He did not.
Sault did not notice that Yelliott was ever intoxicated when he was with her. She had no further contact with Yelliott other than a *402 letter received in June 1986. J.R.Y. was 1 1/2 years to 2 years old during Yelliott's supervised visitation. The trial court reserved ruling on Yelliott's motion to dismiss at the close of the State's case.
Yelliott testified on his own behalf. He stated he had been continuously in custody on the residential burglary charge since October 5, 1984. He reported the neglect of J.R.Y. by her mother to the Department of Children and Family Services. He stated that in March 1984 he told Sault he was not employed. His account of the June 1984 meeting with Sault included reference to his desire not to separate J.R.Y. from her brother, Yelliott's son, who was in the custody of J.R.Y.'s mother. He did acknowledge his expression of willingness to take custody of J.R.Y.
Yelliott testified he voluntarily entered into alcohol counseling at Brokaw Hospital's Chemical Dependency Unit (C.D.U.) on May 13, 1984, and was released on June 11, 1984. He attended Alcoholics Anonymous meetings in June and July 1984, was readmitted to the C.D.U. on July 25, 1984, and was discharged August 3, 1984. At that time, he knew of his pending arrest and started heavy drinking a couple of weeks before being arrested.
On cross-examination, Yelliott stated he understood the service plan he signed, which set for its objectives that he would be able to parent J.R.Y. effectively and provide her with a safe, stable, nurturing environment. He was aware of the presentence report in the residential felony case. He stopped going to Alcoholics Anonymous in September 1984.
The evidence indicates John Yelliott knew he was being considered as a placement source for J.R.Y. and necessarily knew J.R.Y.'s return to her mother was in jeopardy. As the father of J.R.Y. and a party to the neglect proceedings, Yelliott was obligated to make reasonable efforts to eliminate the conditions which were the basis for the removal and to make reasonable progress toward returning the child to a home with her natural mother or father within 12 months after the adjudication of neglect. The initial neglect was while J.R.Y. lived with her mother, without visitation by Yelliott. As to correcting the condition which was the basis for the removal, the mother has surrendered J.R.Y. for adoption.
The surrender of parental rights by J.R.Y.'s mother does not eliminate Yelliott's obligation to make reasonable progress in bringing about the return of J.R.Y. to his home. Yelliott, evidently, had not visited the child for some months before the neglect action although he did instigate that action. Subsequent to placing J.R.Y. in a foster home, Yelliott did exercise visitation rights. Initially, he refused to *403 consider bringing her to his home because of "loose ends," but then he reluctantly agreed to be considered as a possible placement source. The "loose ends" could be attributed to his life-style. Therefore, an examination of that life-style is necessary and relevant in determining if reasonable progress was made between March 13, 1984, and March 13, 1985.
The criminal record set forth in the presentence report clearly establishes an affinity toward violations of the law, many of which resulted in incarceration. Some of the minor offenses related to alcohol. Yelliott's subsequent hospital treatment illustrated the problem with alcohol. Unemployment existed. During the period prior to the October 7, 1984, arrest, he was treated on two different occasions for alcohol dependency problems but only used the benefits of Alcoholics Anonymous for a short period of time. He drank heavily for at least the two weeks prior to the October 7 arrest.
On July 15, 1984, Yelliott continued with his past criminal history by participating in a burglary. Being involved in illegal conduct which could remove him from the possibility of being custodial parent of J.R.Y. is evidence inconsistent with making reasonable progress toward a return of the child.
We agree the mere fact of incarceration is not evidence of failure to make reasonable progress, but the incarceration does not provide Yelliott immunity from a petition to terminate parental rights under section 1(D)(m) of the Adoption Act. (In re Sanders (1979), 77 Ill. App.3d 78, 84, 395 N.E.2d 1228, 1233.) In the present case, the illegal conduct, evidenced by the conviction, is evidence of an attitude inconsistent with the requirement of making reasonable progress toward the return of J.R.Y.
 6 The unfitness of a parent must be proved by clear and convincing evidence. Trial court proceedings involving the unfitness of parents will not be reversed unless it is against the manifest weight of the evidence. Because the trial court has a superior opportunity to view and evaluate the parties and their testimony, that court's findings should be given great deference. In re Brown (1981), 86 Ill.2d 147, 152, 427 N.E.2d 84, 87.
 7 "In determining fitness a court must look not to the conduct of the parent during any single, isolated period of time but to the conduct of the parent over the entire period of time in question, that is, to the entirety of the parent's conduct." Adams v. Adams (1982), 103 Ill. App.3d 126, 132-33, 430 N.E.2d 744, 748.
 8 We come to the conclusion sufficient evidence was presented by the State to sustain a finding of lack of reasonable progress as required *404 under section 1 of the Adoption Act (Ill. Rev. Stat. 1985, ch. 40, par. 1501(D)(m)), and a finding of unfitness, based on all of the evidence, was not against the manifest weight of the evidence.
Affirmed.
SPITZ, P.J., and GREEN, J., concur.