*In re* M.S. *et al.*, Minors (The People of the State of Illinois, Petitioner-Appellee, v. Bernadine King *et al.*, Respondents (Robert Williams, Respondent-Appellant)).

Fourth District    No. 4—91—0413

Opinion filed December 30, 1992.

Larry R. Silkwood, of Urbana, for appellant.

Thomas J. Difanis, State's Attorney, of Urbana (Norbert J. Goetten, Robert J. Biderman, and Leslie Hairston, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE STEIGMANN delivered the opinion of the court:

This case presents the question of whether a finding at an administrative hearing conducted by the Illinois Department of Corrections

(DOC) that a prison inmate violated prison rules, resulting in that inmate's loss of good time, can provide the *sole* basis for terminating that inmate's parental rights. We hold that such a finding cannot, and we reverse the termination of parental rights that occurred in this case.

## I. BACKGROUND

In November 1988, the State filed a petition alleging that the six children of Bernadine King—with whom they then lived—were neglected and abused minors. In that petition, the State alleged that four different men were the fathers of King's children, including respondent Robert Williams, whom the State identified as the father of R.W., a four-year-old child. In its petition, the State identified Williams as "address unknown" and accordingly served him by publication. In fact, on October 19, 1988, Williams began serving a four-year prison sentence in DOC on a felony theft conviction.

In December 1988, the trial court conducted an adjudicatory hearing on the State's petition. King and two of the designated fathers appeared, and they all admitted and stipulated to the State's charge that each of the children was neglected because each was a minor under the age of 18 years whose environment was injurious to his or her welfare when residing with King. At that hearing, the court noted that Williams had been served with notice by publication, that he had not appeared, and that no one had appeared on his behalf.

In February 1989, the trial court conducted a dispositional hearing and again noted that Williams failed to appear. At the conclusion of that hearing, the court removed custody of all the children from King and their fathers and appointed the guardianship administrator of the Illinois Department of Children and Family Services (DCFS) as their guardian with power to place them. The court also directed the respondent mother and fathers to cooperate fully and completely with DCFS and to take other steps to address parental deficiencies in order to have their children returned to their custody.

In September 1989, Williams wrote a letter to the trial judge, informing him that (1) Williams was presently incarcerated in the Pontiac Correctional Center, (2) one of the fathers of another one of King's children was recently incarcerated at Pontiac and informed Williams that his son, R.W., was in DCFS custody, (3) Williams was never informed by anyone about the neglect proceedings involving his son, (4) Williams' family, specifically his grandmother and sister, could provide for R.W., and (5) he would like to obtain custody of R.W. and participate in any further court proceedings in this case. In response,

the trial court in September 1989 appointed counsel to represent Williams in all further proceedings and sent a copy of the letter to the Champaign County State's Attorney, DCFS, and counsel for all other respondents, with a request that the State's Attorney prepare appropriate documents to compel the appearance of Williams at the next post-dispositional review hearing.

As a result, DCFS contacted Williams in October 1989, discussed his situation with him, and prepared a client service plan for him. That plan provided that Williams (1) should complete an alcohol/drug evaluation while incarcerated and cooperate with recommendations based thereon; (2) should keep DCFS informed of his whereabouts within DOC and, after his release, provide DCFS with his address; (3) *"must follow rules within correctional system so that he will be released as soon as possible to pursue reunification with his son"* (emphasis added); and (4) should pursue a general equivalency diploma or vocational training while incarcerated. In October 1989, DCFS later prepared an additional client service plan that required Williams to write periodically to R.W. and to write to DCFS on a monthly basis to learn about R.W.'s circumstances.

In December 1989, the trial court conducted a review hearing that Williams and his attorney attended. In response to the court's inquiry, Williams stated that July 30, 1990, was his "projected out-date." Williams' counsel further represented to the court that Williams' late entry in the case was not Williams' fault. Counsel also said that Williams had written several letters to R.W. in the recent past.

In July 1990, the trial court conducted another review hearing, and Williams and his counsel again attended. At that hearing, DCFS represented that Williams had lost all his DOC "good-time" for six separate violations of prison rules, and that his projected out-date was now July 30, 1992. At that review hearing, the State also filed a supplemental petition seeking findings of unfitness and the termination of parental rights of King and all respondent fathers. Regarding Williams, the supplemental petition alleged that he was an unfit parent under section 1(D)(m) of the Adoption Act (Act) (Ill. Rev. Stat. 1991, ch. 40, par. 1501(D)(m)) because he had failed to make reasonable progress toward the return of R.W. to him within 12 months of the adjudication of R.W.'s neglect.

In January and April 1991, the trial court conducted adjudicatory hearings on the State's petition to terminate parental rights. At these hearings, DCFS social worker Linda K. Wild testified that she spoke by telephone with Williams in October 1989 about the DCFS client service plans. She said they discussed the things he needed to do

while in prison in order to regain custody of R.W. after his release, including "a drug and alcohol evaluation [and getting] enough good time that he can be released as soon as possible." She further testified that DOC authorities needed a written court order before they would permit Williams to obtain a drug and alcohol evaluation while in custody. Because DCFS was not aware of this DOC policy earlier, DCFS workers did not assist Williams in obtaining the necessary written order. Wild acknowledged that Williams wrote to R.W. on a monthly basis, provided him with holiday and birthday greetings, and sent a gift at least once. In January 1990, Williams sent Wild a letter, indicating that he was then an inmate at the Menard Correctional Center psychiatric unit and that he had lost some good time.

Mary Ann Quas, the keeper of records at the Pontiac Correctional Center, brought the DOC records pertaining to Williams to the trial court and testified regarding their contents. Quas also testified that she is the person who calculates a prisoner's projected release date. Quas explained that if a correctional officer wishes to charge an inmate with a violation of DOC regulations, the officer prepares a disciplinary report describing the incident in question. An adjustment committee consisting of three members then reviews that report. The committee acts as a fact-finding body and also provides recommendations on how much good time an inmate should lose. The warden of the correctional center involved then reviews the adjustment committee's recommendation and forwards it to the Director of DOC for final approval. The Director can approve on his own the revocation of an inmate's good time of one month or less in a given calendar year. Any greater loss of good time must be submitted to the Prisoner Review Board for its review and final determination.

Quas examined Williams' file in court and noted that he was sentenced to DOC on October 19, 1988, for four years on a theft conviction. At the time DOC received him, Quas projected his out-date for July 3, 1990. That projection assumed that Williams would earn all good time available. Over Williams' objection, the trial court permitted the State to elicit from Quas that Williams had lost all of his good time and had had his projected release date extended. The court further indicated that it allowed this testimony because

"under [section 3—8—7 of] the Unified Code of Corrections [(Ill. Rev. Stat. 1991, ch. 38, par. 1003—8—7)] ***, the legislature has provided for specific disciplinary procedures, has afforded inmates or residents *** basic due [process] protection before loss of good time can be imposed. And, *** I believe the

results of those procedures *do purport verity, until and unless,*
at least *prima facie* is overcome by some other showing."

In response to further objections by Williams, the State pointed
out that it did not offer his DOC disciplinary records to introduce
thereby descriptions of the incidents in which Williams was found to
have violated a DOC rule or regulation. The court received those dis-
positional reports into evidence and made the following observations:

"THE COURT: I believe that if I understand the State's the-
ory here, *** [the] effort expected of Mr. Williams towards cor-
recting the conditions which led to removal of his children, pro-
gress towards their return of custody to him, included as a
rather basic and fundamental step that he obtain his release
from incarceration as soon as possible, and that if he failed to
do that then the State will be arguing that was a failure to
make reasonable efforts or failure to make reasonable progress.
I believe once the Court allows resort to these records in [the
State's exhibit], to establish that he failed to achieve and main-
tain all possible good time, and that he failed to achieve his ear-
liest possible release from [DOC] the State has then been af-
forded the opportunity to prove all it validly can.

As I indicated earlier, I believe under the statutory provi-
sions, this Court must presume that the action of the Depart-
ment of Corrections was correct. I am not saying that's an irre-
butable presumption, I am not saying it can't be overcome. I
don't know. I don't have to deal with that right now. The point
is, I don't think the State has to bring the people involved in
the original incident which led to the discipline, I don't think
you have to bring those [people] into court. But, I don't believe
you can go further than that ***."

Quas then testified that disciplinary incidents occurred on the fol-
lowing days and resulted in the following lost good time: (1) February
27, 1989—lost six months; (2) September 24, 1989—lost one month; (3)
October 29, 1989—lost three months; (4) November 5, 1989—lost one
month; (5) February 1, 1990—lost one year; and (6) April 5, 1990—lost
one month. As a result of these incidents, Quas projected Williams'
release date as July 3, 1992. Quas also pointed out that other infrac-
tion reports pertaining to Williams existed, but added that he had al-
ready lost all of the good time he could lose.

After Quas testified, the State rested, and Williams moved for a
directed finding. In that motion, Williams argued that because he has
been in DOC custody at all pertinent times regarding R.W.'s neglect
case, he cannot be found to have failed to make reasonable progress

toward R.W.'s return to him. In response, the prosecutor argued that Williams had lost so much good time due to his misbehavior in prison that he had delayed his release by two years. The prosecutor argued further as follows:

"Meanwhile, [as Williams sits in prison due to a loss of good time, R.W.] is sitting in foster care. In [Williams'] position, there is nothing more important for him to do, as far as making progress, than to get out as soon as he can, to *** put himself in a position where he can provide an environment for his child and parent his child. There is nothing more important for him to do while he's in the Department of Corrections than to get out as early as he can. We have a situation where Mr. Williams' projected out date, again, was July 3rd of last year. If he had earned his good time and made progress, he would have been out eight or nine months ago. As we stand now, it's going to be another year or fifteen months until he's even released. So again, that's my theory on him not making progress. And again, most of the loss of his good-time has come following his inclusion in client service plans and involvement with the court."

The trial court denied Williams' motion for directed finding at the close of State's case.

On his behalf, Williams called Wild to testify that he had written 37 letters to her inquiring about R.W.'s health and how he was doing in school and elsewhere. Williams had also asked Wild for R.W. to visit him in prison. Wild testified that Williams also wrote letters frequently to R.W. Wild explained that she did not take R.W. to visit Williams because he was held at the Menard psychiatric unit. She explained that travel time there with a young child would be 5½ hours one way by car. Further, the counselors at Menard psychiatric unit advised Wild that the environment there might prove very difficult for a child to handle.

Williams presented no further evidence, and the prosecutor then repeated the same argument he made earlier concerning Williams' loss of good time, requiring as a result that he serve a longer prison sentence than DOC originally projected. In response, Williams' counsel argued that the State's position concerning whether Williams could have gotten out earlier is speculative.

At the conclusion of the adjudicatory hearing on the termination of parental rights, the court made specific findings with regard to the respondent mother and each of the respondent fathers, and found all of the respondent parents unfit. Regarding Williams, the court com-

mented that it was "clearly a closer question," but that the court believed that Williams, starting in October 1989, understood what he needed to do in order to obtain custody of R.W. The court then stated its conclusion regarding Williams as follows:

"In fact, there is only one thing to which the Court could hold [Williams] responsible in regard to making progress in this case, and that is, get out of the penitentiary. That's the only thing that could be expected of him under the facts of this case. So, the question is, in terms of requiring [him to] secure his release from [DOC], ·what is reasonable. \*\*\* It would \*\*\* be reasonable to say, all right, Mr. Williams, the first step to take towards the return of custody to you is get out of jail \*\*\* in two years, or by July 3rd of 1990. It is within his control as to when he gets out. And, I believe that is a reasonable requirement, get out as soon as you can. Mr. Williams hasn't done so. And, in fact, he could not have more profoundly frustrated that step towards reunification with his son. \*\*\*

One must bear in mind[ ] that Mr. Williams, at this point, has not [*sic*] been incarcerated in the penitentiary for better than a third of his son's life, and that percentage will be even greater when he is finally released. He could have been out July 3rd of 1990. He could have now been seven months towards the reunification of himself with his son. And, in fact, he may well have accomplished it by now, if he had simply obeyed the [DOC] rules \*\*\*. He not only failed to do so, he failed to do so repeatedly, over and over and over again \*\*\*. That's not reasonable. That's a failure to make reasonable progress. And, I don't believe it is reasonable or consistent with the legislative purpose underlying this provision, to require a child to wait four years in foster care when he only had to wait two.

For that reason, I believe that the State has proven Count I, and I find by clear and convincing evidence that the respondent father, Robert Williams, is an unfit parent by reason of having failed to make reasonable progress towards the return of the child to him within twelve months of the time the child was adjudged to be neglected."

## II. Analysis

Section 3—6—3 of the Unified Code of Corrections (Code) (Ill. Rev. Stat. 1991, ch. 38, par. 1003—6—3) governs the procedures for the early release of persons committed to DOC. Section 3—6—3(a)(1) states that DOC shall prescribe rules and regulations for the early re-

lease of prisoners because of good conduct. (Ill. Rev. Stat. 1991, ch. 38, par. 1003—6—3(a)(1).) Section 3—6—3(a)(2) provides that such rules and regulations shall grant each prisoner one day of good conduct credit—also known as "good time"—for each day served in prison. (Ill. Rev. Stat. 1991, ch. 38, par. 1003—6—3(a)(2).) Section 3—6—3(c) provides that DOC shall also prescribe rules and regulations for revoking good time for violating prison rules. (Ill. Rev. Stat. 1991, ch. 38, par. 1003—6—3(c).) Section 3—8—7(e) of the Code sets forth some of the procedural protections for prisoners who face losing their good time due to allegations that they violated prison rules. Ill. Rev. Stat. 1991, ch. 38, par. 1003—8—7(e).

In response to these sections of the Code, DOC has promulgated regulations governing the loss of good time. (See 20 Ill. Adm. Code §504 (1991); see also 20 Ill. Adm. Code §1610.170 (1991) (Prisoner Review Board regulation regarding how the board will decide cases where amount of good time at issue exceeds 30 days).) Williams lost his good time in the present case as a result of some administrative hearings conducted pursuant to these statutes and regulations. DOC found that Williams had violated prison rules often enough to lose all of his good time. Because of that loss, Williams' projected out-date on his four-year prison sentence moved from July 1990 to July 1992.

We pointed out earlier that DCFS in October 1989 discussed with Williams its client service plan for him, which required him to get out of prison as soon as possible. We view that requirement (as, we are confident, the trial court and DCFS viewed it) as a shorthand way of requiring that Williams not violate any prison rules, which, if violated, would result in a loss of his good time.

As the dialogue between court and counsel at the adjudicatory hearing on the State's petition to terminate parental rights made clear, Williams' losing his good time as a result of DOC administrative hearings provided the *sole* basis for the prosecutor's charging—and the court's finding—that Williams was unfit under section 1(D)(m) of the Act for his failure to make "reasonable progress." The question then becomes whether, as a matter of law, those hearings (and the procedures which underlie them) are sufficiently reliable to provide the *sole* basis for a trial court to conclude that an inmate is an unfit parent because of findings adverse to that inmate at those hearings. Because of the significance of the parental relationship and the protection the law affords to it, we hold that the answer to that question is no.

DOC administrative hearings differ significantly from proceedings on petitions to terminate parental rights. First, the burdens of proof

differ between DOC administrative hearings and parental rights termination proceedings. Section 1 of the Act provides that a petitioner charging parental unfitness must prove that charge by clear and convincing evidence. (Ill. Rev. Stat. 1991, ch. 40, par. 1501; *In re Paul* (1984), 101 Ill. 2d 345, 352, 461 N.E.2d 983, 986; *In re A.H.* (1991), 215 Ill. App. 3d 522, 530, 575 N.E.2d 261, 266.) No such burden is imposed on prison authorities in DOC administrative hearings to prove wrongdoing by accused inmates. In addition, the rules of evidence that normally apply in civil cases apply to parental rights termination proceedings. (See *In re J.R.Y.* (1987), 157 Ill. App. 3d 396, 400, 510 N.E.2d 541, 544 (analyzing admissibility of evidence in parental rights termination proceeding); see also Ill. Rev. Stat. 1991, ch. 37, par. 802—18(1) (civil rules of evidence apply at adjudicatory hearing deciding whether a minor is abused or neglected).) However, the formal rules of evidence do not apply to DOC administrative proceedings involving the possible loss of good time, nor should they. In sum, the "process due" prisoners at DOC administrative hearings is—appropriately—*significantly* less than the "process due" parents whose parental rights to their children are in jeopardy.

■ In the present case, if we were to affirm the trial court, the result might be that Williams would have his parental rights terminated based upon evidence presented at the DOC administrative hearings (which resulted in his loss of good time) that (1) would not have been admissible in court in proceedings to terminate Williams' parental rights, and (2) would not have been sufficient to meet the petitioner's burden of proving Williams' parental unfitness by clear and convincing evidence. Accordingly, we conclude that the findings at the DOC administrative hearings regarding Williams cannot provide the *sole* basis for the trial court to find him to be an unfit parent.

A recent decision by the Seventh Circuit Court of Appeals, *Hamilton v. O'Leary* (7th Cir. 1992), 976 F.2d 341, supports our conclusion that the findings at the DOC administrative hearings regarding Williams cannot provide the *sole* basis for the trial court to find him to be an unfit parent. *Hamilton* demonstrates the clear differences in the process due inmates at such hearings and that due respondents alleged to be unfit parents.

In *Hamilton*, the plaintiff, a former prisoner at Stateville Correctional Center in Illinois, brought a section 1983 action against various prison officials involved in the revocation of his good-time credits. The Federal district court dismissed plaintiff's complaint with prejudice for failure to state a claim (*Hamilton v. Scott* (N.D. Ill. 1991), 762 F. Supp. 794), and the Seventh Circuit, on appeal, had to accept as true

all well-pleaded factual allegations contained in plaintiff's complaint. *Hamilton*, 976 F.2d at 343.

That complaint alleged that during a general "shake down" being conducted at Stateville, items were being thrown from other cells into a large vent into which plaintiff's cell faced. Later that same day, a correctional officer wrote up an Inmate Disciplinary Report (known as a "ticket") for plaintiff and the other three prisoners in plaintiff's cell, charging each with possession of six assorted steel pipes and "shanks" found in that cell. *Hamilton*, 976 F.2d at 343.

A week later, the Stateville Adjustment Committee conducted disciplinary hearings for plaintiff and his three cellmates. At that hearing, plaintiff denied having anything to do with the six weapons he was charged with possessing, and he claimed that the weapons had been found in the vent—not on him and not in his cell. (*Hamilton*, 976 F.2d at 343.) The adjustment committee found plaintiff guilty and imposed the same punishment as was imposed on his cellmates, which included a recommendation that 60 days of his good-time credit be revoked. The adjustment committee reported its decision in a form order, and in a section thereof labeled "Reasons," the committee wrote: "Inmate denied guilt ***. *** [T]he Committee notes inmate *** is responsible for whatever is found in [his] cell." *Hamilton*, 976 F.2d at 343.

The adjustment committee's order was reviewed by the Stateville warden, the Director of DOC, and the DOC Administrative Review Board, and ultimately plaintiff had 30 days of good-time credit restored from the 60 days he originally had revoked. *Hamilton*, 976 F.2d at 344.

In this context, the Seventh Circuit wrote the following:

> "Illinois state prisoners have a statutory right to receive good time credits, Ill. Rev. Stat. ch. 38, par. 1003—6—3, and such a state-created entitlement to good time credits is a liberty interest protected by the Fourteenth Amendment. *Wolff v. McDonnell*, 418 U.S. 539, 557, 94 S. Ct. 2963, 2975, 41 L. Ed. 2d 935 (1974). Where a prison disciplinary hearing may result in the loss of good time credits, due process requires that the inmate receive: (1) advance written notice of the claimed violation; (2) the opportunity to call witnesses and present documentary evidence, when consistent with institutional safety and correctional goals; and (3) a written statement by the fact finder of the evidence relied on and the reasons for the disciplinary action. *Id.* at 563-66, 94 S. Ct. 2978-79. In addition, the revocation of good time credit 'does not comport with the mini-

mum requirements of due process unless the findings of the prison disciplinary board are supported by *some evidence* in the record.' *Superintendent, Mass. Correctional Institution, Walpole v. Hill*, 472 U.S. 445, 454, 105 S. Ct. 2768, 2773, 86 L. Ed. 2d 356 (1985) (citation omitted, emphasis added)." *Hamilton*, 976 F.2d at 344-45.

The Seventh Circuit rejected plaintiff's claim and affirmed the trial court. In doing so, it noted that the "ticket" stated that the correctional officer found six weapons in plaintiff's cell while the officer "was shaking down [the plaintiff]." (*Hamilton*, 976 F.2d at 345.) Despite the fact that that officer did not testify at the administrative hearing at which plaintiff lost his good-time credit, the Seventh Circuit held that "[t]he ticket, together with constructive possession, is 'some evidence' of [plaintiff's] guilt." (*Hamilton*, 976 F.2d at 345.) The court further explained its decision as follows:

"According to the facts set forth in the amended complaint and its attachments, the evidence before the Adjustment Committee was that six homemade weapons were found in Cell C-227 which was occupied by and under the control of [plaintiff] and his three cellmates. Thus, on the record before the Adjustment Committee, there was a 25% probability that [plaintiff] was the owner of the weapons. As the evidence in *Hill*, this evidence 'might be characterized as meager' and there is no direct evidence identifying one of the four cellmates as the owner of the contraband. 472 U.S. at 457, 105 S. Ct. at 2775. But given the 25% chance of guilt, 'the record is not so devoid of evidence that the findings of the disciplinary board were without support or otherwise arbitrary.' *Id.* Since the complaint (and its attachments) establish that the Adjustment Committee's decision was supported by some evidence, it fails to state a claim." *Hamilton*, 976 F.2d at 346.

Judge Posner dissented, but his dissenting opinion hardly changes our view of the difference between DOC administrative hearings and formal courtroom civil proceedings:

"On the record before the committee, the probability that the plaintiff had possessed one or more of these weapons cannot be reckoned as greater than one in eight, or 12.5 percent. That is not my idea of 'some evidence,' *Superintendent v. Hill*, 472 U.S. 445, 454, 105 S. Ct. 2768, 2773 (1985), *unless purely collective guilt is deemed to satisfy due process—which in prison circumstances it might be, cf. Ustrak v. Fairman*, 781 F.2d 573, 575 (7th Cir. 1986), but the defendants do not defend the

disciplinary committee's action on that ground." (Emphasis added.) *Hamilton*, 976 F.2d at 347 (Posner, J., dissenting).

●2 In support of the conclusion in this case, we note that "[p]arental rights and responsibilities are of deep human importance and will not be lightly terminated." (*Paul*, 101 Ill. 2d at 351-52, 461 N.E.2d at 985.) Indeed, because the United States Supreme Court has stated that the right to raise one's children is both "essential" and part of the "basic civil rights of man" (see *Meyer v. Nebraska* (1923), 262 U.S. 390, 399, 67 L. Ed. 1042, 1045, 43 S. Ct. 625, 626; *Skinner v. Oklahoma* (1942), 316 U.S. 535, 541, 86 L. Ed. 1655, 1660, 62 S. Ct. 1110, 1113), our conclusion may well be constitutionally mandated.

In *Clayton-El v. Lane* (1990), 203 Ill. App. 3d 895, 900, 561 N.E.2d 183, 186, the court addressed the inevitable tension between the rights retained by prison inmates and the legitimate institutional needs of prisons and wrote the following:

"While prisoners retain rights under the due process clause, this in no way implies that these rights are not subject to restrictions imposed by the nature of the regime to which they have been lawfully committed. There must be mutual accommodation between institutional needs and objectives and the provisions of the Constitution that are of general application. (*Wolff v. McDonnell* (1974), 418 U.S. 539, 556, 41 L. Ed. 2d 935, 951, 94 S. Ct. 2963, 2975.)"

This case presents no challenge to the fairness of these DOC administrative proceedings, nor does Williams argue that he did not receive the process he was due before his good time was revoked. We emphasize these points because we do not mean to criticize in any way prison administrative disciplinary procedures, at least insofar as those procedures are utilized for the purposes for which they were intended: to determine administratively whether (1) a prisoner has violated prison rules, and (2) if so, how much good time he should forfeit.

Nor do we mean to question in any way the legitimacy of the trial court's (or DCFS') directive requiring a prison inmate—whose child has been formally adjudicated a ward of the court and removed by the court's dispositional order from the custody of the child's parents, one of whom is the inmate—to take specific steps designed to achieve a reconciliation and a reunification of the family unit. (See *In re L.L.S.* (1991), 218 Ill. App. 3d 444, 465-66, 577 N.E.2d 1375, 1390.) Further, the trial court can properly hold the inmate accountable—including terminating his or her parental rights—if the inmate fails to make "reasonable progress" under section 1(D)(m) of the Act because the inmate failed to follow such a directive.

This case provides an example of the very point we wish to emphasize. Here, the trial court and DCFS both expressed concern about Williams' obtaining a drug evaluation and, if necessary, counseling. If the paperwork had been appropriately completed so that drug counseling and evaluation were made available to Williams, and he nevertheless willfully refused to comply with the directive that he obtain such counseling and evaluation, then the court could properly consider proof of such willful refusal as evidence of the inmate's failure to make "reasonable progress" within the meaning of section 1(D)(m) of the Act.

We agree with the trial court's goal of trying to provide R.W. with the stable, loving, and *permanent* (as opposed to foster) home that we would like all children to have, and we sympathize with the quandary in which the court found itself as it addressed Williams' situation. Nonetheless, for the reasons stated, we must reverse the trial court's determination that Williams is an unfit parent under section 1(D)(m) of the Act.

Reversed.

KNECHT, J., concurs.

JUSTICE McCULLOUGH, dissenting:

As the majority points out, respondent was directed to cooperate fully and completely with DCFS and to take steps to address parental deficiencies in order to have his child returned to his custody.

Respondent was well aware of the importance of early release from the penitentiary in order to be reunited with his son. In a December 1989 review hearing, he stated his projected out-date was July 30, 1990. Six months later, he had lost all of his good time and his projected out-date was then July 30, 1992, some two years later than his first projected out-date.

The record shows all of his good time was lost because of six separate violations of prison rules. He lost one month for sexual misconduct, three months for threats and intimidation, an additional month for sexual misconduct, an additional year for sexual misconduct and one month for theft and assault.

Respondent clearly had the opportunity to make reasonable progress toward the return of R.W. to him. He did have to comply with prison rules, not a particularly burdensome obligation.

As the majority points out, there is no challenge to the fairness of the DOC administrative proceedings nor does respondent argue he did not receive due process before the good time was revoked.

I do not agree that *Hamilton* suggests a different result.

We have stated repeatedly that reasonable progress exists when a parent's compliance with directives given for the return of a child is sufficiently demonstrated. Sufficient compliance means that there is an expectation that the parent will fully comply with the directives in the near future. Minimal progress will not prevent a finding of unfitness; a child cannot be condemned to a life of uncertainty and placement in foster homes while the courts exercise endless patience with the parents. *L.L.S.*, 218 Ill. App. 3d at 461, 577 N.E.2d at 1387.

Here, R.W. was four years old in November 1988. Respondent had begun his four-year sentence in DOC on October 19, 1988. Because of respondent's conviction and wilful actions while in prison, he will have spent half of his child's life incarcerated. Such conduct does not comport with our decision concerning reasonable progress.

Clear and convincing evidence was presented to the trial court showing respondent to be unfit. I fear we are condemning this child to a life of uncertainty. 

The trial court's order was not against the manifest weight of the evidence and should be affirmed.